1
                    UNITED STATES DISTRICT COURT
2                   WESTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION
3       _____

4       UNITED STATES OF AMERICA,

5                           Plaintiff,
                                          DOCKET NO. 1:16-cr-242
6       vs.

7
        LAWRENCE GERARD NASSAR,
8
                            Defendant.
9       _____/

10

11         TRANSCRIPT OF ARRAIGNMENT, INITIAL PRETRIAL CONFERENCE,

12                      AND DETENTION HEARING

13          BEFORE UNITED STATES MAGISTRATE JUDGE RAYMOND S. KENT

14                       GRAND RAPIDS, MICHIGAN

15                         December 21, 2016

16

17      Court Reporter:          Glenda Trexler
                                 Official Court Reporter
18                               United States District Court
                                 685 Federal Building
19                               110 Michigan Street, N.W.
                                 Grand Rapids, Michigan 49503
20

21      Proceedings reported by audio recording, transcript produced by

22      computer-aided transcription.

23

24

25

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3          MR. SEAN M. LEWIS
            UNITED STATES ATTORNEY
 4          330 Ionia Avenue, N.W.
            P.O. Box 208
 5          Grand Rapids, Michigan 49501-0208
            Phone:  (616) 456-2404
 6          Email:  Sean.lewis2@usdoj.gov

 7    FOR THE DEFENDANT:

 8          MR. MATTHEW RYAN NEWBURG
            NEWBURG LAW, PLLC
 9          316 Taylor Street
            Grand Ledge, Michigan 48837
10          Phone:  (517) 505-2323
            Email:  Matt@newburglaw.com

11

12                            *   *   *   *   *

13                                    Grand Rapids, Michigan

14                                    December 21, 2016

15                                    1:31 p.m.

16                    P R O C E E D I N G S

17          THE COURT:  This is 16-cr-242, United States versus

18    Lawrence Gerard Nassar.  Mr. Lewis appears on behalf of the

19    United States and Mr. Newburg on behalf of Dr. Nassar.

20          Dr. Nassar, we're here this afternoon, we have three

21    matters scheduled for hearing.  The first is an arraignment.

22    It's going to sound almost identical to the initial appearance

23    we did last week.  The only -- or the big difference being at

24    the appropriate time I'm going to ask Mr. Newburg to enter a

25    plea on your behalf to the charges against you.
```

1           The second matter up is an initial pretrial

2   conference.  Mr. Newburg has filed a one-page form with me

3   before court.  I'll go through that with you.  And the

4   government has filed a longer form in which it details some of

5   the kinds of evidence it claims to have against you.  And I'll

6   go through that with you as well when we get there.

7           And then the last matter up this morning will be a

8   bond hearing.  The government will have the burden of proving

9   by a preponderance of the evidence that you are a risk of

10  nonappearance or by clear and convincing evidence that you're a

11  danger to the community.  If it fails to do that, I'll order

12  you released on bond.

13          My first question for you today is the same as it was

14  last week, and that is how far you got in school.  I don't

15  remember where you got your M.D.

16          *THE DEFENDANT:*  Um, D.O., osteopathic physician,

17  Michigan State University.

18          *THE COURT:*  All right.  And where did you do your

19  undergrad?

20          *THE DEFENDANT:*  University of Michigan, Ann Arbor.

21          *THE COURT:*  All right.  Dr. Nassar, do you have any

22  physical or mental condition that would make it difficult for

23  you to understand the charges or follow what's happening in

24  court?

25          *THE DEFENDANT:*  No, Your Honor.

1        *THE COURT:*  In the last 24 hours, have you had any

2   drugs, alcohol, or medicine that might impair your ability to

3   either understand the charges or follow the proceedings?

4        *THE DEFENDANT:*  No, Your Honor.

5        *THE COURT:*  Dr. Nassar, you have the right to remain

6   silent.  You don't have to say anything to me about these

7   charges.  You don't have to say anything to Mr. Lewis.  You

8   don't have to say anything to any member of law enforcement.

9   But if you were to talk to anybody other than Mr. Newburg, your

10  statements could be used against you in later court

11  proceedings.

12       Do you understand that?

13       *THE DEFENDANT:*  Yes, Your Honor.

14       *THE COURT:*  You have the right to a lawyer.  You're

15  always free to hire your own lawyer.  You've hired Mr. Newburg.

16  But let me say to you that if at any time you were unable to

17  continue Mr. Newburg as your lawyer, let's say for example you

18  could no longer afford to pay him, you have only to ask me, and

19  if you qualify financially, I will appoint a lawyer to

20  represent you.

21       Do you understand that?

22       *THE DEFENDANT:*  Yes, Your Honor.

23       *THE COURT:*  Dr. Newburg [sic], have you received a

24  copy of the Indictment?

25       *MR. NEWBURG:*  We have, Your Honor.

1                    *THE COURT:*  All right.

2                    *MR. NEWBURG:*  I've also gone through the Indictment

3      with my client.  We'll waive the reading of the Indictment.

4                    *THE COURT:*  Thank you.

5                    Dr. Nassar, you are in fact the Lawrence Gerard

6      Nassar named in the Indictment?

7                    *THE DEFENDANT:*  Yes, Your Honor.

8                    *THE COURT:*  And is your name spelled correctly there?

9                    *THE DEFENDANT:*  Yes, Your Honor.

10                   *THE COURT:*  All right.  The Indictment charges you

11     with two crimes and then makes civil claims against you.  The

12     two crimes are contained in Counts 1 and 2.

13                   Count 1 charges you with receipt of child

14     pornography.  The government claims that between September 2004

15     and December 2004 in Ingham County you received over the

16     internet images of child pornography, some of which are

17     identified by file name in the count.

18                   Do you understand what you're charged with in

19     Count 1?

20                   *THE DEFENDANT:*  Yes, Your Honor.

21                   *THE COURT:*  Count 2 charges possession of child

22     pornography.  The government claims that between February of

23     '03 and September of this year, also in Ingham County, you

24     knowingly possessed one or more computer disks, electronic

25     files, and other materials containing images of child

1    pornography.  And again some of those are specifically

2    identified in the count.

3           Do you understand what you're charged with in

4    Count 2?

5           *THE DEFENDANT:*  Yes, Your Honor.

6           *THE COURT:*  Finally, the forfeiture allegation is a

7    civil claim.  The government is asking that it be allowed to

8    seize and keep any property of yours used or intended to be

9    used to commit the offense you may be convicted of, including

10   but not limited to an AcomData hard drive.

11          Do you understand the nature of the forfeiture

12   allegations?

13          *THE DEFENDANT:*  Yes, Your Honor.

14          *THE COURT:*  If you were to be convicted of Count 1,

15   the maximum penalty that the Court could impose would be a

16   period in prison of not less than five years or more than 20

17   years, a fine of up to $250,000, a period of supervised release

18   of not less than five years, and up to lifetime supervision.

19          Supervised release is a time following your release

20   from any prison term during which you would remain under the

21   supervision of Judge Janet Neff.  Judge Neff is the trial judge

22   assigned to your case and the judge who will sentence you if

23   you're ever convicted of anything.

24          Judge Neff will impose conditions on your supervised

25   release.  If you were to violate any of those conditions, you

1    could be sent back to prison.

2              There is a court cost or special assessment of a

3    hundred dollars.  And you may be required to pay restitution to

4    any of the victims.

5              Do you understand the maximum penalties on Count 1?

6              *THE DEFENDANT:*  Yes, Your Honor.

7              *THE COURT:*  On Count 2 the maximum penalties include

8    not more than 20 years in prison, a fine of not more than

9    $250,000, again supervised release of not less than five years

10   and up to life, a court cost of $100, an additional special

11   assessment of $5,000, and again you could be ordered to pay

12   restitution to the victims.

13             Do you understand the maximum penalties on Count 2?

14             *THE DEFENDANT:*  Yes, Your Honor.

15             *THE COURT:*  Dr. Nassar, you have important

16   constitutional rights in this case.  We have talked about two

17   of them already.  We've talk about your right to remain silent

18   and we've talked about your right to a lawyer.

19             You've also received another important constitutional

20   right already, and that is the right to have the evidence

21   against you reviewed by a grand jury.  A grand jury is a group

22   of 16 to 23 residents drawn from the community.  They meet here

23   in this courthouse and review evidence presented to them by

24   Mr. Lewis and his colleagues.  Their job is then to determine

25   whether or not the evidence gives rise to probable cause to

1  believe somebody has committed a federal crime.

2          In your case the jury reviewed the evidence and

3  concluded there was probable cause to charge you with the two

4  crimes laid out in the Indictment.  We know that for two

5  reasons.  One, the document you're charged with is called an

6  Indictment.  That's a document a federal grand jury uses to

7  charge somebody with a crime.  And secondly, on the last page

8  the Indictment has been signed by the foreperson of the

9  grand jury.  So we know you've actually received that right

10 already.

11         You have other very important rights, including, of

12 course, the right to be presumed innocent, which you are as you

13 sit here in court this afternoon.  You have the right to have

14 the government prove you guilty beyond a reasonable doubt on

15 each and every element of the two crimes that it's charged you

16 with.  That would occur at a speedy and public trial before 12

17 jurors drawn from the community.  These would be 12 entirely

18 different people than the folks who sat on the grand jury and

19 reviewed the evidence in your case.

20         At that trial you would have the right through

21 Mr. Newburg to question or cross-examine the government's

22 witnesses, to call your own witnesses and have the court order

23 them to appear and testify.  You would have the right to

24 present other evidence which you believe demonstrates you're

25 not guilty of these charges.

1          And finally, you would have the right to either

2     testify yourself or remain silent and not have your silence

3     used against you in any way.

4          We have projected up on the screen a Defendant's

5     Rights Form which summarizes your constitutional rights.   Is

6     that your signature at the bottom of the form?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Did you read and understand that form

9     before you signed it?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Do you understand the constitutional

12    rights you have in this case?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Dr. Nassar, there's four ways you can

15    plead here this afternoon.  The first is not guilty.  Second,

16    you can say nothing or stand mute, in which case I will enter a

17    plea of not guilty for you.  Third, you could plead guilty.

18    And fourth, with the consent of Mr. Lewis and me, you could

19    plead something called no contest which has essentially the

20    same effect as a guilty plea.

21             Do you understand your four options?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  Mr. Newburg, how does Dr. Nassar plead to

24    the two counts of the Indictment?

25             MR. NEWBURG:  He enters a plea of not guilty to each

1    count.

2         *THE COURT:*  All right.  A not-guilty plea will be

3    entered on each count.  Dr. Nassar, that concludes the

4    arraignment.

5         We're going to move now to the pretrial conference.

6    I'm going to start with the form which Mr. Newburg filed.  In

7    it he's asking that if your case goes to trial that it be a

8    jury trial as opposed to a trial before Judge Neff without a

9    jury.

10        He's asking that the government disclose whether it

11   intends to introduce evidence that you have engaged in conduct

12   somehow similar to the conduct charged in this case on some

13   other occasion.

14        And finally, Mr. Newburg has agreed on your behalf to

15   provide the government with any information that you're

16   required by law to provide.  There isn't very much of that, but

17   he's agreeing to do what the law requires.

18        Mr. Lewis, any questions for Mr. Newburg?

19        *MR. LEWIS:*  No, thank you, Your Honor.

20        *THE COURT:*  All right.  We're going to turn, then, to

21   the government's form.

22        The government states that it has no written records

23   of statements made by you.  There are, however, statements made

24   at the time of your arrest and also that you apparently

25   consented in writing to the seizure and search of certain

1    electronic devices.

2            The government has looked into your prior criminal

3    history and found none.

4            The government has other evidence including child

5    pornography computer records and business records.

6            Mr. Lewis, on your Initial Pretrial Conference

7    Summary Statement there's a reference in Section C to "See

8    discovery letter," but it doesn't seem to be attached here.

9            *MR. LEWIS:*  Correct.  I provided that to Mr. Newburg

10   via USA FX.  It's a very detailed indexing of all of the

11   discovery materials that are provided with reference to Bates

12   numbers.  It just goes through and lays out in detail for him

13   to help him navigate the voluminous discovery in this case.

14           *THE COURT:*  All right.  Thank you.

15           So, Dr. Nassar, Mr. Newburg evidently has access to

16   and perhaps has even already downloaded from the cloud,

17   whatever that means, all of the government's discovery in this

18   case.  I'm sure he'll -- if he hasn't already -- I'm sure at

19   the appropriate time he'll sit down with you and go through

20   that with you in detail.

21           There were two federal -- state or federal search

22   warrants?

23           *MR. LEWIS:*  There was one state search warrant and

24   two federal search warrants.  They have all been provided to

25   Mr. Newburg.

1          *THE COURT:*  Okay.  So I'm sure Mr. Newburg will go

2     through those with you as well.

3          The government expects to have reports following

4     computer forensic examination of devices it has seized.

5          In response to Mr. Newburg's question about other

6     similar conduct by you, the government is giving you notice

7     that it does intend to introduce evidence, including evidence

8     of possession of child pornography on numerous devices, as well

9     as the destruction and attempted destruction or spoliation of

10    evidence as documented in police reports provided to

11    Mr. Newburg.  And there may be additional such evidence which

12    the government will provide notice of at least two weeks prior

13    to the final pretrial conference.

14         The government is also asking for a jury trial.  It

15    estimates it will last three to four days.

16         All right.  Mr. Lewis, you checked a box here that --

17    in the Miscellaneous section saying it may be that Mr. Newburg

18    has a potential conflict of interest.  What's that all about?

19         *MR. LEWIS:*  Your Honor, while agents were present at

20    the defendant's home on Friday arresting him, his wife was also

21    present.  After the defendant had been removed, one of the

22    defendant's current lawyers in the state court matter was on

23    the phone with the wife providing her with advice to include

24    not to cooperate with law enforcement and not to provide them

25    with information.

1              I've spoken to Mr. Newburg.  He has stated to me that

2     he and cocounsel do not technically represent the wife, but

3     given that information and the nature of the legal advice that

4     was being provided, I felt it was incumbent to make that known

5     to the Court.  It at least raises the specter of a potential

6     conflict of interest.  If they weren't representing her, one

7     could ask why they were providing her advice not to cooperate

8     with law enforcement, which raises a whole bunch of additional

9     issues.  But I did want to raise it with the Court.

10             *THE COURT:*  All right.  Thank you, Mr. Lewis.

11             I would say for the record, I don't perceive -- if

12    there's no more to it than that, I don't perceive that that

13    would give rise to a conflict of interest.  Obviously the

14    government is free to pursue that with Judge Neff by filing a

15    motion seeking Mr. Newburg's disqualification, but I don't see

16    it.  And that's not to say Judge Neff may not see it

17    differently.

18             And finally, Dr. Nassar, there's a plea negotiation

19    policy that you should be aware of.  If you intend to have

20    Mr. Newburg attempt to negotiate a plea bargain for you in this

21    case, the plea bargain would have to be finalized not less than

22    two weeks before the final pretrial conference if you were to

23    receive the maximum benefit in terms of a reduced sentence.

24    Mr. Newburg will keep a close eye on that date for you, and I'm

25    sure he'll talk to you at length about the issue of plea

1    bargaining or all of your other options.

2             Mr. Newburg, any questions for Mr. Lewis on the

3    government's form?

4             *MR. NEWBURG:*  No, Your Honor.

5             *THE COURT:*  Dr. Nassar, that concludes, then, the

6    initial pretrial conference, leaving only the issue of bond.

7             Mr. Lewis, how are we going to proceed on this

8    matter?

9             *MR. LEWIS:*  Your Honor, the government is continuing

10   with its request for detention pending resolution of this

11   matter.  There is a presumption in this case.  I know the Court

12   is going to want to hear additional information.  It is

13   important to present that information.  So I would, if the

14   Court is ready for me to proceed with proofs, call

15   Special Agent Rod Charles.

16             *THE COURT:*  Sure.  Call your witness.

17                           ROD CHARLES

18             *(The oath was administered)*

19             *THE WITNESS:*  I do.

20             *THE CLERK:*  Please have a seat.

21             *MR. LEWIS:*  May I proceed?

22             *THE COURT:*  Yes.

23                        DIRECT EXAMINATION

24   *BY MR. LEWIS:*

25   *Q.*   Good afternoon.  Will you introduce yourself to the Court,

*DIRECT EXAMINATION OF ROD CHARLES*

1  please, and spell your name for the record.

2  A.   Yes.  My name is Special Agent Rod Charles.  My last name

3  is C-H-A-R-L-E-S.

4  Q.   Are you an FBI agent?

5  A.   I am.

6  Q.   How long have you been employed with the FBI?

7  A.   Approximately 22 years.

8  Q.   In your work as an FBI agent, do you investigate cases

9  involving the sexual exploitation of children to include the

10  distribution, receipt, and possession of child pornography?

11  A.   I do.

12  Q.   In the course of your work as an agent, have you been

13  involved in the investigation of the defendant, Larry Nassar,

14  related to the charges in the Indictment in this case?

15  A.   I have.

16  Q.   Do you see the person who you have been investigating here

17  in the courtroom?

18  A.   I do.  He's the gentleman at the defense table in the red

19  shirt, glasses, and black hair.

20          MR. LEWIS:  For the record, the witness has

21  identified the defendant.

22  Q.   (BY MR. LEWIS)  Now, Agent Charles, back in late August of

23  2016, this year, did MSU Police begin an investigation into the

24  defendant after a victim with the initials RD filed a report?

25  A.   Yes, they did.

*DIRECT EXAMINATION OF ROD CHARLES*

1   *Q.*   That victim, RD, was that somebody who had been a patient

2   of the defendant's back in or around 2000?

3   *A.*   Yes.

4   *Q.*   And how old was RD at the time?

5   *A.*   Fifteen.

6   *Q.*   Can you tell the judge a little bit about the nature of

7   the offense as reported by RD.

8   *A.*   She was a gymnast and had some back, hips, and she

9   described it as gluts and a wrist injury, and she started

10  seeing Dr. Nassar on February 2nd, 2000, where he was adjusting

11  her hip.  And while adjusting her hip, his hand slipped up

12  inside her pants, her leotard, and two fingers went inside her

13  vagina.

14  *Q.*   And according to RD, was that something, that digital

15  penetration of her vagina, that happened one time or more than

16  one time?

17  *A.*   More than once.  There were subsequent visits on

18  February 23rd where he was -- penetrated her vagina, was

19  thrusting and sweeping, and then he also then when he pulled

20  his fingers out massaged the vaginal area.

21  *Q.*   Okay.  Did RD describe whether or not the defendant was

22  sexually -- visibly sexually aroused in some way?

23  *A.*   At a later appointment, I believe it was March 3rd or

24  March 8th, he was doing similar -- the thrusting and sweeping

25  of the vagina and also penetrating her anus with his -- her --

*DIRECT EXAMINATION OF ROD CHARLES*

1  excuse me -- his thumb.  And during that, when he stopped that,

2  he was cupping her breast at one point, and she looked and

3  noticed that he had an erection.

4  Q.   Now, during these times that RD reported that the

5  defendant was digitally penetrating her, was he wearing gloves?

6  A.   No, he was not.

7  Q.   And then did he obtain RD's consent to digitally penetrate

8  her?

9  A.   No, he did not.

10  Q.   Now, on August 30th of this year did the defendant become

11  aware of the police investigation?

12  A.   Yes.

13  Q.   Specifically was he interviewed by MSU Police on that

14  date?

15  A.   He was.

16  Q.   Now, did there come a time the following month in

17  September of this year when MSU made the decision to terminate

18  the defendant?

19  A.   Yes, I believe it was September 16th they sent him a

20  termination or intent to terminate notice.

21  Q.   Had the defendant been assigned a work laptop?

22  A.   Yes.

23  Q.   Did there come a time when MSU directed him to turn that

24  laptop back in?

25  A.   Yes.  Like September 18th he sent an email acknowledging

*DIRECT EXAMINATION OF ROD CHARLES*

```
 1    this intent to terminate.  On September 19th he turned in the

 2    work top -- excuse me -- work laptop.  And on September 20th

 3    there was an official termination letter.

 4    Q.   The laptop that the defendant turned in on the 19th, was

 5    it later forensically examined?

 6    A.   It was.

 7    Q.   Was there anything on that computer?

 8    A.   No, it had been completely wiped, including the operating

 9    system.  So everything was removed off of it.

10    Q.   Now, that next day, so September 20th of this year, did

11    MSU Police execute a search warrant at the defendant's home in

12    Holt, Michigan?

13    A.   They did.

14    Q.   At the time they executed that warrant, was there a trash

15    can that was pulled out by the curb in front of that home?

16    A.   Yes.  Trash pickup was late that day, and the trash bin

17    was placed out by the road, so near the end of the search

18    warrant one of the officers had looked into the trash

19    receptacle, yes.

20    Q.   And what did he see?

21    A.   And on top of the trash was an external hard drive

22    entitled an Acom hard drive.  They then secured the trash, took

23    it back to the department and searched the rest of the trash.

24    They found a small plastic bag, a grocery bag, with three other

25    external hard drives in it.  Two of them had handwritten on it
```

*DIRECT EXAMINATION OF ROD CHARLES*

1   "Larry Nassar, Gymnastics," and one, I believe, had his phone

2   number on it.

3        The other one was a Toshiba that was unlabeled.  They were

4   all three in the same trash bag.  Or little grocery bag.

5   *Q.*   All right.  I want to talk to you about that Acom for a

6   moment.  Was that device, that external hard drive, later

7   forensically examined?

8   *A.*   It was.

9   *Q.*   Did the examiner find any child pornography on that

10  device?

11  *A.*   He did.  Approximately 37,000, I believe, images.  Video

12  and images.

13  *Q.*   All right.  Now, that 37,000 images, did that include both

14  the saved images and videos as well as images and videos that

15  were recovered forensically?

16  *A.*   Yes, they were.  There was a lot in the unallocated space.

17  *Q.*   But at a bare minimum, were there in excess of 16,000

18  images and videos that were saved, they were not deleted?

19  *A.*   Correct.

20  *Q.*   Now, can you give the judge a sense as to -- when you say

21  child pornography, what did these images and what did these

22  videos depict?

23  *A.*   They ranged from a range of erotica.  Young girls under

24  the age of 12 in attire or just exposing themselves to

25  hard-core pornography with penetration with a male penis,

*DIRECT EXAMINATION OF ROD CHARLES*

1    dildos.   Two females, young females together.

2         Or then you had the videos where young girls under the age

3    of 12 were self-stimulating themselves or using Sharpies or so

4    forth.

5    *Q.*   And you may have mentioned it, but what age range?

6    At least at this point what's the youngest that you can recall

7    seeing?

8    *A.*   I'd say approximately six, seven, somewhere in that range.

9    The majority under 12 years of age, not developed.

10   *Q.*   All right.   And then so in addition to the Acom, has child

11   pornography been found on some of the other devices?   For

12   instance, that Toshiba you mentioned?

13   *A.*   Yes, the Toshiba hard drive that was found in the trash

14   with the other two hard drives that had Larry Nassar's name on

15   it, that Toshiba was found to have -- the forensic examiner was

16   able to recover maybe 30 images, I can't remember the exact

17   number, of video and still pictures.

18   *Q.*   Is it fair to say, at least based on what the examiner

19   knows at this point, most of the items of child pornography on

20   the Toshiba was deleted, it's in unallocated space?

21   *A.*   That is correct.

22   *Q.*   All right.   And then how about any of the items in the

23   house?   Were any items of electronic evidence seized from the

24   house?

25   *A.*   Yes, there was a number of items, but on the Acer laptop

*DIRECT EXAMINATION OF ROD CHARLES*

1    that was found in the house there was also a number of images

2    similar to the Toshiba that were in unallocated space that were

3    recovered that were child porn of the same nature, including a

4    video.

5    Q.    Now, is it fair to say that the forensic review of the

6    materials seized from the defendant's home is ongoing?

7    A.    It is.

8    Q.    Now, we talked about a little earlier a sexual assault

9    allegation by the victim RD.  Has MSU Police received any other

10   allegations, reports by other victims that the defendant

11   sexually assaulted them?

12   A.    Yes, they have received numerous complaints.  I think they

13   are up close to maybe 60, way over 50 victims, complaints so

14   far.

15   Q.    Okay.  Now, we're not going to talk about all of them

16   today, but is one of those victims that has come forward, has

17   the state actually gone ahead and charged the defendant with

18   CSC in the first degree?

19   A.    They have.

20   Q.    Is that a victim with the initials KS?

21   A.    It is.

22   Q.    According to KS, approximately when did the sexual abuse

23   occur and how old was she?

24   A.    It started around January of 1999, and she was

25   approximately six years of age at the time.

*DIRECT EXAMINATION OF ROD CHARLES*

1   *Q.*   And when did it end?

2   *A.*   It ended around 2004.  She would have been around 12 years

3   of age.

4   *Q.*   Can you tell the judge a little bit about what it was that

5   the defendant did to that victim?

6   *A.*   Yes.  This victim was -- her parents were family friends

7   of the Nassars, and they frequently went over to the Nassar

8   residence.  She described probably every other week almost.

9        During those visits the defendant often went to the

10  basement where she was at and initially had started playing

11  hide and seek, he would then find her but pretend he didn't see

12  her and stand in front of her, expose himself, and masturbate

13  in front of her.

14  *Q.*   When you say expose himself, do you mean --

15  *A.*   Expose his penis, correct.  And I think he made the

16  comment something about "If you want to see or touch it, you

17  can."

18  *Q.*   Did the conduct escalate?

19  *A.*   Yes.  Then it went on where he was on a couch with her.

20  One instance was described as having a blanket over him, would

21  rub her feet against his penis until he got an erection.  And

22  he would penetrate her vagina with his finger countless times

23  she described.

24       When she was in sixth grade she saw something about this

25  conduct isn't right and that's when she reported it and it

1    stopped at that point.

2    Q.    Now I want to talk about another victim with the initials

3    JT.   In or around 2012 -- I'm sorry -- 2011 was JT a patient of

4    the defendant's?

5    A.    Yes, she was another gymnast that suffered some heel, rib,

6    some back and wrist injuries and saw Larry Nassar for about 12

7    treatments from 2011 until approximately August of 2012.

8    Q.    And how old was she in the beginning?

9    A.    In 2011 she was 10 years old.   And when it ended

10   approximately 11 years old.

11   Q.    Has that victim, JT, reported whether or not the defendant

12   digitally penetrated her?

13   A.    Yeah, the first occurrence when she was 12 years old,

14   she --

15   Q.    12 years old?

16   A.    Excuse me, 10 years old.   My apologies.   She discussed the

17   first visit where he was adjusting her ribs and was touching

18   her vagina under the leotards.

19        And then at 11-year-old, when she was 11, she had a foot

20   injury, and he explained something about massaging the back of

21   her legs and calves would help the foot injury, and while doing

22   that he penetrated her vagina with his fingers, including

23   touching her clitoral area very hard she said.   She perceived

24   him as being sweaty, and he used a lot of hand sanitizer

25   afterwards.

*DIRECT EXAMINATION OF ROD CHARLES*

1    *Q.*   Was he wearing gloves?

2    *A.*   No.

3    *Q.*   And did the defendant obtain JT's consent or her parents'

4    consent to be digitally penetrating her?

5    *A.*   No.

6    *Q.*   I want to talk to you about a victim with the initials MW.

7    Was that girl a patient of the defendant's back in or around

8    2014?

9    *A.*   Yes.

10   *Q.*   How old was she at that time?

11   *A.*   She was 13.

12   *Q.*   And has JT [sic] reported whether or not the defendant

13   digitally penetrated her?

14   *A.*   Yes.  She described when she was 13 years old she was in

15   his office getting treatment where he was rubbing her back,

16   calves, legs, and hamstring, and he went inside her vagina.  He

17   had done this on multiple return visits for a hamstring -- it

18   was a hamstring injury.

19   *Q.*   Was he wearing gloves?

20   *A.*   No, he was not.

21   *Q.*   Did he obtain her consent to digitally penetrate her?

22   *A.*   No.

23   *Q.*   Just earlier this year, two thousand --

24          *THE COURT:*  Mr. Lewis, just to move things along, you

25   don't need to ask the agent whether she consented.  They can't

1    consent.  They are children.  There's no issue of consent here.

2             *MR. LEWIS:*  Very good.

3    Q.  *(BY MR. LEWIS)*  All right.  Earlier this year, in or about

4    April of 2016, did MW go back to the defendant for some more

5    treatment?

6    A.  Yes.

7    Q.  During that visit in April of this year, did MW report

8    some inappropriate sexual-type behavior by the defendant?

9    A.  Yeah, when she was 15, April 16th I have it, in April, she

10   went in for treatment of a hip flexor and he had pulled her

11   shorts exposing her vagina.  She felt very uncomfortable.

12   Q.  The last of these reporting victims I want to talk about

13   is somebody with the initials EP.  Between the fall of 2015 and

14   earlier this year, 2016, was EP a patient of the defendant's?

15   A.  Yes.

16   Q.  How old was she?

17   A.  She would have been 13 to 14 during that period.

18   Q.  According to EP did the defendant digitally penetrate her?

19   A.  Yes.

20   Q.  Was he wearing gloves?

21   A.  No.

22   Q.  All right.  The last -- the last thing I want to talk

23   about is you had mentioned that Toshiba hard drive that came

24   out of the trash.  Do you recall that?

25   A.  Yes, I do.

### DIRECT EXAMINATION OF ROD CHARLES

1  Q.   Is review of the material on that Toshiba ongoing?

2  A.   Yes, it is.

3  Q.   In the review of that Toshiba has the forensic analyst

4  found any pictures or videos depicting the defendant engaged in

5  troubling sexual conduct with children?

6  A.   Yes, he has.

7  Q.   And can you tell the judge about that?

8  A.   Yes.  There's a large number of video in there from a

9  GoPro video camera it appears to be.  And the forensic examiner

10  is just starting to go through those manually and review them.

11  And we found one video that includes Dr. Nassar in a swimming

12  pool with several children, a number of children.  And in part

13  of the clip towards the end he has the GoPro filming

14  underwater.  Most of the video is just him wandering the pool

15  filming, and then all of the sudden he grabs this young girl's

16  hand and shoves it into the crotch, vaginal area of another

17  young girl, and you can see another hand pull back away.

18  Q.   And there you have sitting in front of you what has been

19  marked as Government Exhibit Number 1.  It was previously shown

20  to defense counsel.  Do you recognize that exhibit?

21  A.   I do.

22  Q.   What is it?

23  A.   It's a screen shot of that image.

24  Q.   Does it fairly and accurately show that portion of the

25  video?

*DIRECT EXAMINATION OF ROD CHARLES*

1    A.   It does.

2              *MR. LEWIS:*  I move to admit that exhibit for purposes

3    of this hearing.

4              *THE COURT:*  Mr. Newburg, objections?

5              *MR. NEWBURG:*  No objections.

6              *THE COURT:*  It's admitted.

7              *MR. LEWIS:*  Thank you, Your Honor.

8    Q.   *(BY MR. LEWIS)*  And there appears to be in the center of

9    that photograph an adult's hand; is that correct?

10   A.   That is correct.

11   Q.   Whose hand is that?

12   A.   Dr. Nassar's.

13   Q.   Now, was that the only video that the analyst has found so

14   far or were there more?

15   A.   There were more.

16   Q.   Can you tell the judge about what else he saw?

17   A.   Well, there was another one where -- similar thing where

18   Mr. Nassar is filming and he goes up to a young lady, a young

19   female, and you see his hand kind of go on her hip with his

20   thumb in the vaginal area.  And then as he goes in, you see the

21   tip of the thumb pressing into the vagina through the swimsuit.

22   She has a swimsuit on.

23   Q.   When he's doing that, does it appear in the video that

24   he's inserting his thumb all the way up to the first knuckle?

25   A.   Yes.

*DIRECT EXAMINATION OF ROD CHARLES*

1   Q.   You have in front of you what has been marked as

2   Exhibits 2 and 3.  Do you recognize those exhibits?

3   A.   I do.

4   Q.   What are they?

5   A.   Those -- these are images, are screen shots, frame shots

6   of those pictures that I just described.

7   Q.   Do they fairly and accurately depict those portions of the

8   video as you've described?

9   A.   They do.

10           MR. LEWIS:  I move Exhibits 2 and 3 into evidence.

11           THE COURT:  Objections?

12           MR. NEWBURG:  No objections.

13           THE COURT:  They are admitted.

14   Q.   (BY MR. LEWIS)  Now, in each of those exhibits, 2 and 3,

15   there appears to be an adult male's hand.  Do you see that?

16   A.   Yes.

17   Q.   From a review of the evidence, whose hand is that?

18   A.   Dr. Nassar's.

19   Q.   What date were those images -- those videos, I'm sorry --

20   written and saved to that Toshiba?

21   A.   The dates on that we had recovered were April 2014, and

22   there's a modified date, I believe, of September of 2014.

23   Q.   And are there some additional videos as well that show

24   things such as the defendant pulling down the tops of young

25   girls, hands down in and around the pubic area, and things of

*CROSS-EXAMINATION OF ROD CHARLES*

1    that nature?

2    *A.*   Yes.

3    *Q.*   The children that we saw in Exhibits 1, 2, and 3,

4    approximately how old did they appear to be?

5    *A.*   They weren't developed yet, so I'm saying under the age of

6    12.

7            *MR. LEWIS:*  The Court's brief indulgence.

8            Those are all the questions I have.  Thank you.

9            *THE COURT:*  All right.  Mr. Newburg,

10   cross-examination?

11           *MR. NEWBURG:*  Thank you.

12                  CROSS-EXAMINATION

13   *BY MR. NEWBURG:*

14   *Q.*   You didn't personally see Dr. Nassar put those hard drives

15   into the trash, did you?

16   *A.*   I did not.

17   *Q.*   And other individuals and adults lived at that house,

18   right?

19   *A.*   That is correct.

20   *Q.*   And you don't know if those individuals had access to or

21   were in possession of those hard drives while they were in the

22   house, do you?

23   *A.*   I do not.

24   *Q.*   Okay.  And the exhibits that are depicted which you just

25   were discussing and the images that were found that you

*REDIRECT EXAMINATION OF ROD CHARLES*

1    previously testified to on those hard drives, they were not

2    involved -- involving Dr. Nassar's children, were they?

3    A.    I don't know who the children are.  It appears to be a

4    swimming pool in his backyard based on the deck there, but I

5    can't positively identify them.

6    Q.    You can't say those children were his, though, right?

7    A.    They appeared -- some of them appeared to be, but I don't

8    know that those specific ones are, no.

9    Q.    Okay.  And during the course of your investigation, did

10   you investigate the medical procedures that were given by

11   Dr. Nassar in some of the individuals that have made complaints

12   to the Michigan State University Police Department?  Do you

13   know whether those procedures, medical procedures, are

14   generally accepted?

15   A.    My understanding is there is a procedure that is

16   legitimate.  It's the method that may be questioned.

17   Q.    Okay.  Thank you.

18   A.    And the purpose or what the injury -- for what injury

19   you're performing it for.

20   Q.    Okay.  I don't have anything further.  Thank you.

21          THE COURT:  All right, Mr. Newburg.

22          Redirect?

23          MR. LEWIS:  Just briefly.

24

25

1                            REDIRECT EXAMINATION

2     *BY MR. LEWIS:*

3     *Q.*    Counsel just asked you whether or not anyone saw

4     Dr. Nassar, the defendant, place those hard drives in the

5     trash.  Do you recall him asking that question?

6     *A.*    I do.

7     *Q.*    Were there other materials on those drives written and

8     authored by the defendant contemporaneous with when the child

9     pornography was saved to those drives?

10    *A.*    Yes.

11              *MR. LEWIS:*  That's all.  Thank you.

12              *THE COURT:*  You may step down, Agent Charles.  Thank

13    you for your testimony.

14              *THE WITNESS:*  Thank you.

15              *THE COURT:*  Additional evidence, Mr. Lewis?

16              *MR. LEWIS:*  No, thank you, Your Honor.

17              *THE COURT:*  Mr. Newburg, evidence?

18              *MR. NEWBURG:*  No, thank you, Your Honor.

19              *THE COURT:*  Okay.  Argument then.

20              *MR. LEWIS:*  Thank you, Your Honor.

21              The starting point, of course, is the statutory

22    presumption that the defendant should be detained given the

23    nature of the charges.  But here we have much, much more than

24    that.  Any case involving child pornography is, of course,

25    serious.  There are real victims.  But here the defendant has

shown through his conduct that he's a hands-on offender.  He's
a hands-on offender in almost every context and position that
he can work himself into.  It's conduct that's been going on
for more than 15 years.  And it's not just conduct that
happened a while ago and he's moved on.  It's conduct that's
continued to this year.  It's conduct that, as the Court has
heard, he took advantage of a childhood friend.  He took
advantage of numerous patients who were in his care.  And then
even in a swimming pool, he is -- and the Court has the photos
in front of it -- just taking advantage of those children
sexually, touching them, inserting -- the Court can see he's
got his thumb jammed in there up to the first knuckle, taking
videos of it.  He has shown through his conduct that he cannot
safely be released into the community.

He's also shown through his conduct that he has been
engaged in the destruction and attempted destruction of
evidence.  He's wiped his hard drive to destroy evidence.  He's
discarded the hard drives containing the child pornography,
which is, again, another significant risk factor.

Given his conduct and the nature of the charges in
this case, even if we didn't enjoy the presumption, I think the
government has proven by clear and convincing evidence there
are no conditions that can guarantee the safety of children,
including his own children in that house, if he were to be
released.  So we ask the Court to keep him detained for the

1    safety of the community while this case is pending trial.

2              *THE COURT:*  All right.  Thank you, Mr. Lewis.

3              Mr. Newburg, argument?

4              *MR. NEWBURG:*  Thank you, Judge.

5              Judge, the question really is whether there's a risk

6    of -- risk to the community or nonappearance.

7              One of the issues that the Court should be aware of

8    is that a CPS investigation was conducted and there was no harm

9    to my client's children that were disclosed by them.  And

10   within a 24-hour period of CPS involvement, he was back in his

11   home.  That happened this year after the -- just shortly prior

12   to the execution of the search warrant which was testified here

13   today.

14             Dr. Nassar has known that he's been under

15   investigation since August of this year, if not earlier, and he

16   has routinely -- in fact at one point went and met with MSU

17   Police Department, gave an interview.  He did not flee.  He did

18   not run.  When he was arrested in Ingham County and arraigned,

19   he was placed on a tether, and he was found by FBI agents at

20   his house in the tether.  He's been in compliance with the bond

21   conditions that were imposed by Judge Allen in the state court.

22             There is -- his passport has been surrendered.  And

23   I'm going to ask and indicate to the Court that the

24   recommendation is based on -- the pretrial statement is based

25   on a recommendation that would not allow him to be around any

1    other members of the community and be tethered to his home.  I

2    would ask the Court acknowledge and adopt that recommendation.

3            He will appear for court.  Frankly, Judge, he's got

4    no other means at this point to go anywhere or to do anything.

5    I think he's demonstrated throughout the course of not just

6    this investigation when the search warrant was executed but

7    prior to that that he intends on staying here and addressing

8    the allegations that are against him.  Thank you.

9            *THE COURT:*  You're welcome.

10           I would note for the record that I have read the

11   Pretrial Services Report, adopt it, and make it part of the

12   record of this proceeding.

13           The Pretrial Services Department has recommended

14   release subject to a number of conditions, including home

15   detention with location monitoring per the Adam Walsh Act and

16   no contact with children other than his own.

17           The Court's decision regarding bond must begin with

18   the Eighth Amendment to the United States Constitution which

19   creates the right to reasonable bail.  The Eighth Amendment's

20   requirements are codified in the Bail Reform Act,

21   18 U.S.C. 3142(b), which requires that the Court order the

22   pretrial release of the defendant on personal recognizance

23   unless the Court determines the release will not reasonably

24   assure the appearance of the defendant or the safety of the

25   community.  Even where release on personal recognizance may not

1    be appropriate, 3142(c) requires the Court to order release

2    subject to the least-restrictive condition or a combination of

3    conditions that will assure appearance and safety of the

4    community unless the Court concludes that there are no such

5    conditions.

6            Dr. Nassar, your case is different than some cases

7    that come before me.  Mr. Lewis has pointed out that

8    difference.  Because of the charge -- charges pending against

9    you, federal law creates a presumption that there is no

10   condition or combination of conditions that will ensure the

11   safety of the community.  And further, it gives rise to a

12   presumption that you should be held in custody while the case

13   is pending.

14           On the two issues before me with regard to bond, they

15   are first risk of flight.  The government bears a burden of

16   proving by a preponderance of the evidence that Dr. Nassar

17   poses a risk of flight.  On the issue of danger to the

18   community, the government's burden is to prove by clear and

19   convincing evidence that he is such a danger.

20           3142(g) lays out the factors the Court is to consider

21   in making its bond determination.  The nature and circumstances

22   of the offense are one of those factors.  The Court must

23   determine whether the offense involves a crime of violence or a

24   narcotic drug offense.  While the charged offenses are not

25   crimes of violence or narcotic drug offenses, there's certainly

1    plenty of testimony from Agent Charles that would support a

2    finding that Dr. Nassar has been involved in violent crimes

3    against children.

4          The second factor the Court is to consider is the

5    weight of the evidence against the defendant.  I would

6    characterize the evidence in this case as very heavy against

7    Dr. Nassar.

8          The history and characteristics of the defendant,

9    including physical and mental condition.  As far as I know

10   there's no physical or mental issues with Dr. Nassar.  At least

11   none flagged in the Pretrial Services Report.  He certainly has

12   family ties to Lansing.  His wife lives there.  His three

13   children live there.  His mother lives in the Eastern District

14   of Michigan, along with two siblings who he also maintains

15   regular contact with.

16         He is not presently employed since his termination by

17   Michigan State.

18         He's lived in the Lansing area since approximately

19   1988.  No history of drug or alcohol abuse.  No criminal

20   history.  And thus no history of failing to appear at any court

21   proceedings.

22         Mr. Newburg points out that Dr. Nassar has known

23   about these charges for some time, and despite knowing that he

24   has not fled.  In fact, at least at some level has attempted to

25   cooperate with the investigation of this matter.  He's

surrendered his passport, so he would be unable to leave the country legally in any event.

I don't believe risk of flight is an issue here.  In any event, I find that the government has not demonstrated by a preponderance that Dr. Nassar is a flight risk.  I think if he was going to go, he would have gone, and he hasn't.

That leaves us, then, with two issues really.  The presumption, which I haven't dealt with yet, and then the question of danger to the community.

The two issues are interrelated, and it's my findings based upon a totality of the circumstances, relying upon principally the testimony of Agent Charles on the witness stand, that Dr. Nassar has not overcome the presumption that he's a danger to the community.  In fact, quite to the contrary.  If the testimony of Agent Charles is accurate, Dr. Nassar poses the worst kind of risk to our community:  A risk to our children.  We simply can't have somebody like him free in the community with access to children as young as six years old.  And 60 victims so far have come forward and said that he has sexually assaulted them.  If true, that's appalling, and I certainly am not going to set Dr. Nassar loose in our community until this case is resolved.  So it's my finding that he'll be remanded to the custody of the marshals for the balance of this case.

Mr. Lewis, anything further from the United States on

1    this matter?

2              *MR. LEWIS:*  No, thank you, Your Honor.

3              *THE COURT:*  Mr. Newburg, anything from you, sir?

4              *MR. NEWBURG:*  No, Judge.  Thank you.

5              *THE COURT:*  All right.  You're welcome.

6              Dr. Nassar, I know you disagree with my decision here

7    this afternoon, but do you understand what happened in court?

8              *THE DEFENDANT:*  I don't understand why -- yes.

9              *THE COURT:*  Do you have any questions for me before I

10   adjourn your case?

11             *THE DEFENDANT:*  No.

12             *THE COURT:*  All right.  Good luck to you, sir.  We're

13   adjourned.

14             *THE CLERK:*  All rise.  Court is adjourned.

15         *(Proceeding concluded at 2:22 p.m.)*

16                   *   *   *   *   *

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2            I certify that the foregoing is a transcript from the

 3   Liberty Court Recording System digital recording of the

 4   proceedings in the above-entitled matter, transcribed to the

 5   best of my ability.

 6            I further certify that the transcript fees and format

 7   comply with those prescribed by the court and the Judicial

 8   Conference of the United States.

 9

10   December 23, 2016

11

12                              /s/ Glenda Trexler
                                Glenda Trexler, CSR-1436, RPR, CRR
13

14

15

16

17

18

19

20

21

22

23

24

25
```