1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF MICHIGAN

3                            SOUTHERN DIVISION

4      UNITED STATES OF AMERICA,

5                  Plaintiff,            No:  1:16cr242

6        vs.

7      LAWRENCE GERARD NASSAR,

8                  Defendant.

9

10     Before:

11                        THE HONORABLE JANET T. NEFF
                             U.S. District Judge
12                         Grand Rapids, Michigan
                             December 7, 2017
13                         Sentencing Proceedings

14     APPEARANCES:

15              MR. ANDREW BIRGE, U.S. ATTORNEY
                By:  MR. SEAN LEWIS
16              330 Ionia NW
                PO Box 208
17              Grand Rapids, MI 49501
                616-456-2404
18                          On behalf of the Plaintiff;

19              MR. MATTHEW NEWBURG
                Newburg Law PLLC
20              316 Taylor St.
                Grand Ledge, MI 48837
21              517-505-2323

22              MS. SHANNON MARIE SMITH
                Law Offices of Shannon M. Smith, P.C.
23              1668 S. Telegraph Rd., Suite 140
                Bloomfield Hills, MI 48302
24              248-636-2595
                            On behalf of the Defendant.
25
                REPORTED BY:  MS. KATHY J. ANDERSON, RPR, FCRR

December 7, 2017

PROCEEDINGS, 10:58 a.m.

THE CLERK:  All rise, please.  This court is now in session.  Please be seated.

THE COURT:  Good morning, everybody.

MR. NEWBURG:  Good morning.

THE COURT:  This is the date and time set for sentencing in case number 1:16cr242, the United States of America versus Lawrence Gerard Nassar.

And before we get started with the formal sentencing hearing, ladies and gentlemen, a couple of things I want to mention.  First of all, as everybody knows, this case is one that has some good amount of emotion involved with it.  We have a lot of people here in the courtroom, and I caution you to please remain calm throughout the proceedings.

Secondly, if anybody has a cell phone, a pager, a laptop, or any other electronic device, they must be turned off completely now so as not to, a couple of reasons really, so as not to disturb the proceedings, first of all, and secondly, because they are not permitted to make any connection with the outside world while we're in session.

Counsel, may I please have appearances and any introductions.

MR. LEWIS:  Good morning, Your Honor.  Sean Lewis appearing on behalf of the United States.  I'm joined at

counsel table by Special Agent Rod Charles of the FBI, and
Special Agent Mike Hess also of the FBI.

THE COURT:  Thank you, Mr. Lewis.

MR. NEWBURG:  Good morning, Your Honor.  Matt Newburg
on behalf of Mr. Nassar who is seated and to my left.

MS. SMITH:  Good morning, Your Honor.  I'm Shannon
Smith also on behalf of Mr. Nassar seated to my right.

MS. BLYTHE:  Good morning, Your Honor.  Molly Blythe
also on behalf of Mr. Nassar.

THE COURT:  Thank you.  On July 11, 2017, the
defendant appeared before Magistrate Judge Ray Kent and entered
a plea to Counts I, II and III of the superseding indictment.

Count I charges him with receipt and attempted receipt
of child pornography which is contrary to 18 U.S.C.
2252A(a)(2)(A), and 2252A(b)(1).

The potential penalties for that case range from a
five-year mandatory minimum to a 20-year maximum term of
imprisonment and a $250,000 fine.

Count II charges him with possession of child
pornography which is again contrary to 18 U.S.C.
2252A(a)(5)(B), and 2252A(b)(2).  Here the maximum potential
penalty is 20 years imprisonment and a $250,000 fine.

Count III charges destruction and concealment of
records and tangible objects, and that offense is contrary to
18 U.S.C. 1519, and there the maximum potential penalty is

1    20 years imprisonment and a $250,000 fine.

2              The offense behaviors can be fairly summarized as

3    follows:  Counts I and II, over a long period of time the

4    defendant knowingly received voluminous amounts of child

5    pornography over the Internet.  The images he received and

6    possessed included images of children under the age of 12.

7              Count III, the defendant knowingly deleted or altered

8    information on his computer; he paid to have his computer wiped

9    clean of all data, and he attempted to dispose of devices

10   containing child pornography knowing that he was under

11   investigation by the government, and with the intent to impede

12   or obstruct that investigation.

13             The magistrate judge's report and recommendation was

14   adopted by this Court on July 26, 2017.  There is a written

15   plea agreement which I accept at this time and I specifically

16   find that the charges to which the defendant has entered guilty

17   pleas adequately reflect the seriousness of his actual offense

18   behavior.

19             There is also a, I'm sorry, a presentence report

20   prepared by United States Probation Officer Eric Hoffman who is

21   also in the courtroom this morning.

22             Mr. Lewis, does the government have any objections,

23   errors, omissions as to the facts as recited in the report

24   which is quite lengthy?

25             MR. LEWIS:  No, Your Honor.

1         THE COURT:  Thank you.  Mr. Newburg, on behalf of the

2 defendant, any concerns about the factual recitation in the

3 report?

4         MR. NEWBURG:  No, Your Honor.

5         THE COURT:  Thank you.  Mr. Nassar, a couple of

6 questions for you.  You don't have to stand up.  Please stay in

7 your seat.

8         Have you read the presentence report?

9         THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  And have you discussed it carefully and

11 thoroughly with your attorneys?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And as you sit here in the courtroom this

14 morning, is there anything about the report that you either do

15 not understand or about which you have any question at all?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  Okay.  Now, your attorneys are, as --

18 yeah, they are retained.  Have you been satisfied with the work

19 that they have done on your behalf during the course of this

20 case?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Okay.  The presentence report includes a

23 calculation of the guidelines and the advisory guidelines

24 ranges as follows:

25         Counts I and II are grouped, and the calculations as

to them are singular, that is to say, the offense levels and so forth apply to both.  And there the offense level is 41, the Criminal History Category is 2, and those two calculations place this case in Zone D of the grid where the advisory range is actually 360 months to life, but inasmuch as the maximum statutory penalties for Counts I and II are 20 years, the advisory range for incarceration becomes 240 months; the supervised release range is five years to life, the fine range is 50,000 to $500,000, restitution has been calculated in this case at $57,488.52, in addition to which there is a special assessment of $5,000 on Count II pursuant to the Justice for Victims of Trafficking Act of 2015.

There is also a special assessment of $100 per count for a total of $200 on Counts I and II.

Count III, which is also grouped with Counts I and II, also succeeds to an offense level of 41, and we retain the Criminal History Category of 2, incarceration range there is 240 months also, supervised release range is three years, the fine range remains 50,000 to $500,000, restitution is the same, and there's an additional special assessment of a hundred dollars on Count III, and so we have a total special assessment of $300 plus the $5,000 on Count II.

There are no objections to scoring.  And I believe the government has an agreement to move for the single offense level reduction for timeliness of plea, correct, Mr. Lewis?

1    MR. LEWIS:  Yes, the third point I do.

2    THE COURT:  Thank you.  My calculations of the

3    guidelines are the same as Mr. Hoffman's as to all three

4    offenses:  Offense level 41, Criminal History Category 2, all

5    three carry an advisory guideline range of 240 months, as to

6    Counts I and II, supervised release range is five years to

7    life, as to Count III, it's three years, as to all three counts

8    the fine range is 50,000 to $500,000, the restitution is as to

9    all three is $57,488.52.  There's a $100 per count special

10   assessment, and the $5,000 on Count II.

11   There are no motions for departure under the

12   guidelines.  And I would ask counsel if you are in agreement as

13   to the accuracy of the advisory ranges of 240 months per count

14   incarceration, five years to life on Counts I and II supervised

15   release, three years on Count III for supervised release, and

16   the fine range of 50,000 to $500,000.

17   Mr. Lewis, in agreement on the accuracy of those

18   calculations?

19   MR. LEWIS:  I am, Your Honor.  And the 240 per count

20   under the guidelines each would run consecutive to one another.

21   THE COURT:  They can, yes.  Thank you.  Mr. Newburg.

22   MR. NEWBURG:  We are in agreement, Your Honor.

23   THE COURT:  Thank you.  Mr. Newburg, are you going to

24   allocute on behalf of the defendant?

25   MR. NEWBURG:  Yes, Your Honor.

1    THE COURT:  Please come to the podium.

2    MR. NEWBURG:  Thank you.  Your Honor, as the Court is

3  aware based on the presentence memorandum that we submitted to

4  the Court, and as the Court has already articulated, this case

5  has garnered a lot of attention.  And as the Court indicated in

6  its prior order, this case before Your Honor is about child

7  pornography, and I expect that Your Honor is going to hear from

8  my client.  And I think I need to highlight some of the things

9  in the sentencing memorandum.

10    One thing is absolutely clear is that my client is a

11  family man.  He helped his children; he provided help towards

12  an autistic foundation which directly benefited one of his

13  children; he's also a God fearing individual.

14    He has spent a significant period of time over the

15  last year, Your Honor, devoting himself back to the things that

16  he was grounded in which is his religion.

17    He's also deeply remorseful for the actions that

18  brought him before Your Honor.  As we indicated in our

19  presentence memorandum, he wishes he could turn back the hands

20  of time, and I'm sure every defendant before Your Honor asks

21  that they could do the same.

22    THE COURT:  It's a common theme, Mr. Newburg.

23    MR. NEWBURG:  I understand.  And he is obviously not

24  able to do that.  And he is here before Your Honor to accept

25  the punishment that this Court is going to hand down for those

1     actions.

2          He's going to be missing a lot.  And he understands

3     that what he's missing are based on his own actions.  His

4     family is going to be, his children are going to be growing up

5     without him, but he's also lost the things that are closest to

6     him which are not just his family, but his job, the respect of

7     individuals, and the person that he was attempting to become.

8          I think the Court is going to hear from him that this

9     was a disease that he had been fighting with for a long period

10    of time.  And now it has come to light.

11          I'm going to ask that the Court consider everything in

12    our presentence memorandum, all the letters of support that we

13    provided to this Court, and fashion a sentence that is adequate

14    based on the conduct in this case.  Thank you.

15          THE COURT:  Thank you.  Mr. Nassar, at this point in

16    time you have the right to speak in your own behalf to tell me

17    anything that you think is important to me to know about you,

18    about the offenses you have committed, or anything else that

19    you think might be pertinent to my sentencing decision.  If you

20    would like to speak, please come to the podium with Mr. Newburg

21    and I'll hear what you have to say.

22          THE DEFENDANT:  Thank you, Your Honor.  You know, this

23    is rather difficult, as you can imagine.  You know, I stand

24    before the Court here, you know, for the sentencing of the

25    criminal counts.

1    And I have been, you know, battling with this

2  obviously for a considerable period of time.  It was a

3  skeleton, you know, in my closet.  It was something that, you

4  know, I'm very ashamed of.  There is not a single person who

5  knew, you know, about this.  And I never sought to try and get

6  help to try to manage it myself.  My ego got in the way of

7  trying to take care of things.  And over the years I did try to

8  manage it and consistently tried to improve myself, you know.

9    And, you know, I have lost everything because of this.

10  I mean it's horrific.  You know, I think if you had a choice

11  between, I don't know, you know, if you think about, you know,

12  alcoholism and you think about, you know, drug doping and so

13  forth, and this, and they are very difficult.  You know, if you

14  really look at it from that perspective.  And the choices that

15  people make along the road, you know, you go back and you

16  wonder how I got down this path to begin with, you know.  And I

17  have been able to avoid the drugs, been able to avoid the

18  alcohol, and the stress under situations that you can be placed

19  under, you know, and unfortunately, you know, I chose wrongly.

20    You know, and the loss of the love and respect of the

21  people that I once had is gone; that really hurts because I

22  really did try to be a good person; I really did try to help

23  people.  You know, it's hard to sleep.  I mean you think about

24  all the things that I'm going to miss, all the things that I

25  have done, all the things that I would have liked to have done.

1    It just, the thought of the pain that I have caused to

2    other people is far greater.  It's one of the things that I've

3    asked my priest to pray for.  I have never asked my priest to

4    pray for me.  I always asked my priest actually to pray for

5    those people who have been offended, including those people in

6    the images.  Because I understand that even though, you know,

7    on the sidelines you could say whenever you view those pictures

8    you are harming those people.  And I don't think people fully

9    understand that.  I think that's something that really needs to

10   be understood in this day and age with the digital media that

11   there's out there.

12   If anything, people -- I hope this, if there's any way

13   that this can be somehow or other turned into some type of good

14   is for people to use this media frenzy that's been around this

15   to try and get awareness to parents, to try and educate their

16   children a little bit more about it, awareness to peers because

17   a lot of time peer-to-peer pressure is even more significant

18   than parental pressure.  Any which ways we need more education

19   about this.  I really do feel that.  To try and prevent others

20   from being caught in a similar trap.  And I hope that that can

21   be accomplished.

22   I've always been a man of faith.  And I've always

23   spent a lot of time over the last year, you know, asking for

24   forgiveness for myself, and I've asked that God, you know,

25   assist the victims in their healing process.  That I do

1      morning, noon and night.

2             I hope one day that I can be forgiven for my wrongs.

3      And I'll take every day of your sentence to try and better

4      myself, and I will sincerely do that, Your Honor.  Thank you

5      for your time.

6             THE COURT:  Thank you.  Mr. Lewis on behalf of the

7      government.

8             MR. LEWIS:  Your Honor, this defendant's sexual

9      interest in children is what brings him before this Court

10     today.  That sexual interest has manifested itself in two ways

11     in the defendant's life:  Through amassing just an enormous

12     collection of child pornography, and sexually offending against

13     scores of children and young women.

14            These manifestations are in this case inextricably

15     intertwined, and we can not talk about the risk, the harm, or

16     the danger associated with one without talking about the other.

17            Indeed federal law directs us to look at the full

18     scope of the defendant's conduct when we talk about what type

19     of sentence will be appropriate, necessary to protect, deter,

20     and punish.

21            I want to talk about the first manifestation, the

22     child pornography conduct.  The defendant here amassed a

23     collection that is just shockingly large.  Investigators found

24     more than 37,000 images and videos of child pornography.  Each

25     depicts an innocent child, a child who's been sexually abused,

1    exploited and degraded for somebody's sexual pleasure.  The

2    defendant's collection ranged from the very young to teens.

3    Children being raped, sexually molested, digitally penetrated,

4    put on display for someone's depraved sexual gratification.

5         The Court has seen I know some of the exemplars from

6    his collection and can understand firsthand the depravity of

7    what we are talking about here today.  Those images are

8    revolting.  They are nauseating.  And anyone who views them

9    should be feeling anger and pain and not sexual pleasure.

10        As one of the victims of those images has written in a

11   victim impact statement, "Don't you know no one should do that

12   to a little girl?  Don't you know that is wrong?"  And that

13   pain is not just momentary; it endures on and on into the

14   future.  And that is one of the primary harms of this type of

15   offense.  It perpetuates the harm to the children.

16        And the Court indicated earlier in this case we must

17   not lose sight of those victims.  That those victims of child

18   pornography must have a voice, and I agree.

19        Six victims of the child pornography offense or

20   members of the family have submitted statements for the Court's

21   consideration.  They stress this is not a victimless crime.

22   These are pictures of real children in real pain.

23        These children describe the horrible agony of knowing

24   their pictures are being circulated out there on the Internet.

25   They talk about how just that knowledge makes them feel like

1    they are being offended against, victimized all over again,

2    again and again.

3          They express to the Court their pain and sadness and

4    confusion, how anybody can take pleasure in their pain.  And

5    they ask that someone like the defendant who took pleasure,

6    that he receive great punishment because his actions fueled the

7    demand for that type of product.  And at the end of the day he

8    was a participant in their exploitation.

9          Child 8 who suffered personally at the defendant's

10   hand submitted a victim impact statement; she talked about the

11   way his conduct affected her, but she also tried to give a

12   voice to those child pornography victims.  She asked on their

13   behalf if they were sitting here in this courtroom today what

14   would today's proceedings say.  Would it convey the message

15   that when somebody looks at those images for their own deviant

16   pleasure that it is evil and wrong?  Will the sentence today

17   say that that harm really matters?  What will it say about what

18   each of those precious children is worth?

19         It's bad enough that child pornography perpetuates the

20   harm, but there is another layer of harm associated with it as

21   well.  And that is it validates and normalizes the sexual abuse

22   and exploitation of children.  Which puts other children at

23   harm.  It fuels a market for the production of more child

24   pornography, and for some, it encourages them to act out

25   personally against children.

The victims of the child pornography appreciate this, they understand it, and one has written, "Will some sick person see my picture and then get the idea to do the same thing to another little girl?"

And the Court can see in this case how the defendant started down the road toward production himself with Child 1 and Child 2.  And in addition to that, the Court has before it overwhelming evidence about the scores and scores of children the defendant personally sexually assaulted.  And that brings us to the second manifestation of his sexual interest in children.

The numbers before the Court are simply staggering. The duration of this conduct spanned two decades.  Its scope was nationwide.  It wasn't just limited here in Michigan.  In fact, it wasn't even limited to the United States.  The Court knows from the presentence report that the defendant sexually assaulted members of the U.S. Olympic team in countries across the globe.

This type of hands-on conduct would be appropriate for the Court to consider in any case.  But in this case it is particularly appropriate for the United States District Court to consider it given the nationwide scope of his conduct.

And there is a link between the child pornography conduct and the hands-on offense.  As I briefed for the Court, the consideration of hands-on conduct is within the heartland

of this type of case.  The defendant's victims recognize this too.  One has written to the Court, "I became his real life child pornography subject, his play thing, his experiment."

This hands-on conduct speaks loudly and clearly to the defendant's true history and characteristics.  The Court heard his gloss on his history and his characteristics here today.  But actions speak louder than words.  And it's those actions I think that underscore the need to deter and to protect.

The defendant abused his position of trust and authority.  He was a doctor, somebody that we as a society trust implicitly.  But he was more than that.  He was a doctor to children, the people who parents hold most dear.  They trusted him with those children, and he violated that trust.  These victims were particularly vulnerable to his abuse.  They were young.  The Court has read there's one as young as six.  Others nine, ten, 11.  And scores or dozens in their teens.  They were hurting; they were in pain; and they were desperate for relief; they were pursuing a dream.

And they trusted a man who to them seemed larger than life.  This man was the doctor for the U.S. Olympic team.  The defendant took advantage of that position to groom and manipulate his victims.  He made a point, the Court has read about it, decorating his office with memorabilia to awe and wow these little girls.  He took advantage of an environment where the girls were often alone, without a parent, without a

1    chaperone.  He took advantage of a culture where only the

2    strong survive.  Those who complain, those who are weak, don't

3    make it.  He gained the trust of these little girls and

4    violated it.

5         And the Court has written submissions from two dozen

6    of those girls.  They express in raw and powerful terms the

7    true devastation.  I know the Court has them and has reviewed

8    them, and the Court has seen firsthand the victims's sense of

9    betrayal, shattered innocence, and trust, their pain and

10   confusion, their struggles with stress, anxiety, depression,

11   their resentment, their inability to trust, their completely

12   changed view of doctors.  And at the end of the day, a deep

13   longing for accountability, for protection, and for justice.

14        On top of all this, the Court has before it the

15   defendant's actions of obstructing justice.

16        When the Court looks at the totality of the facts and

17   circumstances before it, these facts are undisputed.  The harm

18   is profound, and the danger this man poses to the community is

19   real.

20        He has proven through his conduct over 20 years with

21   the child pornography, with the hands-on conduct, that he will

22   offend again.

23        And so that brings us here today.  All eyes are

24   watching what happens here today.  Those in positions of power

25   and influence who are thinking of offending as the defendant

has done are watching and asking, how seriously will this
conduct be taken?  Will this sentence really deter?  The
victims are watching and asking the same thing.  Will others be
deterred?  Will we and other children be protected?

We don't know what tomorrow may bring, Your Honor.  We
don't know what some other Court may do or what the defendant
may do.  He may try to withdraw his plea.  We simply don't know
what will happen another day in another forum.  But I know one
thing.  Today the Court holds justice in its hands.

We ask the Court on behalf of the United States, the
victims here in this room, and the victims across this country
to hold the defendant accountable.  When you fashion a sentence
look at the full scope, please, of his conduct; fashion a
sentence that will punish, that will deter, but that will, most
importantly, ensure that this man can never harm another child.
We ask for the maximum sentence.  Thank you.

THE COURT:  Thank you, Mr. Lewis.  Well, the
guidelines as I think everybody is pretty much familiar with
are advisory but I do have to consult them and consider them
before reaching a sentencing decision reflective of my
underlying duty to impose a sentence which is sufficient but
not greater than necessary to comply with the purposes of
Section 3553(a).

And the statute really lays out a calculus for
evaluating how to reach that decision.  And the first part of

that calculus has to do with balancing the offense, its
seriousness, and so forth against the offender.

And in terms of determining the seriousness of this,
these three offenses, it seems to me that there are a number of
levels that have to be considered:

In the first instance are the pornography, the child
pornography images themselves.  The vast number of photographs
and videos, some of which I have in fact reviewed, is like
nothing, no other offense of this nature that I have reviewed.
And so that in and of itself makes this case somewhat unique.
The number of images, the number of videos, the fact that the
defendant made his own videos, at least one of which included
one of his own children, reflects the vastness of his offense
in the child pornography range where I don't know how many
children are reflected in those photos and images, those videos
that he accumulated over a period of two decades.  There
probably were more on a computer whose data he successfully
arranged to be erased.

And then we have the destruction of evidence, the
third count here today, which clearly reflects the defendant's
understanding of his crimes and the danger that he faced having
committed them.

The second level of the seriousness of this crime
comes in what Mr. Lewis talked about so persuasively in terms
of the trust that has been destroyed; trust in authority

figures in general because the, in the related conduct aspect, the young children and women not only were abused by a trusted physician, but in many instances their concerns were dismissed or overlooked.  And so as Judge Aquilina in Ingham County noted a couple of weeks ago, the defendant here violated the most basic principle of medicine set down by the father of medicine, Hippocrates, what, a couple of millennia ago, "First do no harm."  And in violating that basic tenet of medicine, that Hippocratic oath, he harmed so many young people in terms of their ability to trust.  I cannot imagine what other physicians might feel knowing that when they are alone with a young woman in a treatment room what she might be thinking; whether she is afraid that they will violate that trust as well.

Frankly, I have a hard time considering Mr. Nassar as a physician because he has so thoroughly violated the very concept of the physician as healer.  I think Hippocrates also is the one who said, "Physician heal thyself."  And Mr. Nassar never took the opportunity to do that over a period of 20 years.

The final level I think of this offense, of the seriousness of it is the most personal one.  And that is that, and I did, I have reviewed all of the victim statements that have been submitted, and what is perhaps most devastating is the sense of self worth that these girls and young women have had destroyed and who are trying so hard to restore.

Over and over again in these statements are the comments that indicate they wondered, they questioned at every turn, somebody told them they were wrong, they wanted to know what's wrong with me?  Why am I feeling this way?  When he is this renowned physician, and who am I, just a kid.  And nobody believes me.  And maybe, maybe I am wrong, maybe I'm taking this wrong.  And so that kind of destruction of the sense of self worth and belief in self has got to just be devastating to any young woman.  I think anybody whose had any contact with adolescent children knows how vulnerable they are at that age in their lives.  How difficult they find trying to know how to fit in, trying to know what's important, trying to learn their values, and when somebody keeps telling them what they're thinking is wrong, it's pretty difficult to overcome those barriers.

We then, the statute then says, all right, you've looked at the seriousness of the offense, how do you square that up with the person who committed it?

Mr. Nassar is a 54-year-old now divorced man with three children.  He's well educated.  He held positions of high esteem and trust in the medical field, in the athletic field, in his family, and in his community.  But the dark side of his nature played out away from all of that when he accessed enormous amounts of child pornography and when he sexually abused scores of children.

1    Often, amazingly enough, in highly risky situations

2    where parents were present.  You have to wonder whether he felt

3    omnipotent, whether he felt he was getting away with something

4    so cleverly; a mother sitting in an examination room while he

5    was physically sexually abusing her daughter.  I am a mom of

6    two daughters.  I cannot imagine that kind of a situation.

7    As one of the victims said, "He seemingly had no

8    boundaries.  He had no appreciation of the suffering he was

9    causing both in regard to his consumption of child pornography

10   and in his sexual abuse."

11   And this -- sometimes you can as a judge understand a

12   defendant's criminal offense by understanding a little bit

13   about their background.  This is a man who self reports an

14   almost ideal childhood.  This is a man who had the advantage of

15   excellent educational opportunity.  He described his marriage

16   and his parenting in glowing terms.

17   So where did this come from?  He inflicted deep wounds

18   on helpless children before he got the picture.  He said, it's

19   interesting, he denied at one point that he did any of this for

20   self-gratification.  What he said was when he was interviewed

21   by the probation officer that he accessed child pornography

22   expecting to get stress relief, but when the probation officer

23   asked him if he got any stress relief, he said, "none", yet he

24   continued to look at it, to access it, to accumulate it.  I

25   wonder how long he expected to get anything from it.  Why he

continued to access it when he wasn't getting any relief for

it.  His rationalization wears thin.  He was not seeking stress

relief.  That is nothing more than rationalization.  He was

satisfying the same sexual gratification he sought in abusing

his victims, his live victims.

So we then, the statute says, all right, what do we

hope to accomplish with sentencing.  And Mr. Lewis pretty much

put his finger on it.  There are three things in the goals of

sentencing that stand out in this case:

Punishment of course is one.  But more important in my

view is deterrence and protection of the public.  In the ten

plus years I've been sentencing consumers of child pornography,

those two latter statutory factors have taken on particular

significance.  The defendants I have seen fall into roughly

three categories based on concerns about the dangers of acting

out against live victims after viewing the images they find,

trade, and sell online, and the corollary of protection of the

public from further acts of the defendant.

There are those who pose a low risk of acting out.

Now, we sometimes get evaluations from well-credentialed mental

health professionals based on testing, interviewing, and so

forth that are to some extent reassuring that a particular

defendant after confinement, treatment, and careful monitoring

will not likely pose a danger to child victims.  And so the

deterrence and protection factors are a little bit of less

concern.

And I would note that this is a fairly small percentage of the child pornography offenders that come before this Court.

A larger number fall into a category where the danger of acting out is not at all clear, and sometimes it's more likely than not.  And here the deterrence, protection factor rises to a more significant level, and the balancing act to determine a sentence that is sufficient but not greater than necessary to achieve statutory goals is more difficult.

The third category of child pornography offenders is those who remove all doubt about the dangers they pose for acting out against children.  And Mr. Nassar is the paradigm of this group because he consumed enormous amounts of child pornography and at the same time acted out on very real, very vulnerable victims, hundreds if not thousands of times over a long time span.

For these offenders, like Mr. Nassar, deterrence and protection of the public are the principal concerns in sentencings, and the ones I have focused on.  It's imperative that Mr. Nassar be deterred for as long as possible.

Mr. Nassar was, is, and in my view will continue to be a real and present danger to children.  And it is through consecutive sentencing that I can take into account the need to deter this man from harming innocent girls and young women for

the rest of his life.

Based on his behavior over a long period of time, he has demonstrated that he should never again have access to children.

The final concept or goal of sentencing is to avoid unwarranted disparities.  And I would say to you that there really is no way to calculate that because Mr. Nassar is unique, at least in terms of the experience of this judge.

So the question is whether the guidelines are appropriate, whether the guidelines which suggest the statutory maximum sentencings are properly reflective of the statutory factors.  And I think that they are.  I think that balancing those factors really leaves no question in my mind that the maximum potential penalties are in order here.

The defense asks for a variance from the guidelines essentially saying that Mr. Nassar is not all bad.  And they have submitted letters from family members and so forth.  But I really wonder whether on contemplation if those people who wrote letters had been aware of Mr. Nassar's behavior would say the same thing.  Would say I would trust my children, my young children, my young daughter in his presence alone.  I wonder.

And so pursuant to the Sentencing Reform Act of 1984, my sentence is as follows:

On Count I, 240 months incarceration; on Count II, 240 months incarceration consecutive to Count I; on Count III,

240 months incarceration consecutive to Counts I and II.  And the federal sentencings to be consecutive to the sentencings in state court in case number 116 --  I'm sorry, that's the wrong one.  In Ingham County Circuit Court number 17-526-FC, and in Eaton County Circuit Court number 17-20217-FC.

You know it's almost ironic that all three of the sentencing judges in this case are women.

Supervised release to follow, if it gets to that, of life on all three counts concurrent.  There is a --  you're right, Rick.  Thank you.  Life on Counts I and II, and on Count III, three years.

Supervised release, as I said, to be subject to the standard conditions of reporting and remaining law abiding.  We did provide counsel and the defendant with an order for additional sentencing conditions before we came out.  I believe they have all signed it and I'm looking for it but I can't find it right now.  They have signed it, Mr. Nassar has signed it, Ms. Smith, and Mr. Newburg, and I'm signing it for entry right now.

The fine is waived in this case.  The special assessment and restitution are both included in the order regarding additional sentencing conditions.  Interest on those two is waived.

I do also order the mandatory special assessment of $300.

1          Mr. Newburg, does the defendant have any requests for

2  recommendations to the Bureau of Prisons?

3          MR. NEWBURG:  Not at this time, Your Honor.

4          THE COURT:  Thank you.  I don't recall, does the

5  government, Mr. Lewis, make a motion to dismiss the original

6  indictment?

7          MR. LEWIS:  I do.  It was subsumed within the

8  superseding so, yes, I do.  Thank you.

9          THE COURT:  Thank you.  And there is no forfeiture

10 involved here, correct?

11         MR. LEWIS:  Correct, Your Honor.

12         THE COURT:  Thank you.  All right.  I would ask then

13 if there is any legal objection to the sentence which I have

14 just announced, whether there is anything that is not already

15 on the record why sentence should not be imposed as indicated.

16 Mr. Lewis?

17         MR. LEWIS:  No, Your Honor.  And I would note in

18 those, in the order regarding additional sentencing conditions

19 restitution is ordered, so thank you for that.  And then the

20 other piece that I just wanted to make sure that the record is

21 clear on, in Murphy, the Sixth Circuit stated that the Court

22 must indicate on the record its rationale for imposing a

23 consecutive sentence to the state court sentence.  I think it's

24 clear from the record that the Court is doing that because of

25 the nature and scope and totality of the defendant's conduct;

1    that it is not limited to Michigan and for all the other

2    factors the Court has already articulated.

3              THE COURT:  Correct.  Mr. Newburg, any reason why

4    sentence should not be imposed as I've indicated?

5              MR. NEWBURG:  Your Honor, we would just object to the

6    consecutive sentencing to the state courts.  But we will leave

7    that to Mr. Nassar to address at a later period.  Thank you.

8              THE COURT:  Thank you.  Mr. Nassar, I need to talk to

9    you briefly about your appellate rights in this case, to the

10   extent you have them.  I don't recall from the plea agreement

11   whether appellate rights have been waived.  Probably a lot of

12   them have.  But in any event, when the judgment is entered in

13   this case, which will probably be yet today, that will start a

14   period of 14 days running, and in those 14 days you have to

15   decide if you wish to appeal my sentence.  Now, you obviously

16   need to talk to counsel about that, ask them any questions you

17   might have, seek their advice and so forth.  But it's your

18   responsibility to let them know within 14 days whether you wish

19   to appeal my sentence.  If you do, they will be under a

20   continuing obligation to represent you in that proceeding.

21             Do you understand those two things?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  Okay.  If there is nothing further,

24   Mr. Lewis.

25             MR. LEWIS:  No, thank you.

1          THE COURT:  Mr. Newburg.

2          MR. NEWBURG:  No, Your Honor, thank you.

3          THE COURT:  We are adjourned.

4          THE CLERK:  All rise, please.  This court is now

5    adjourned.

6          (Proceedings concluded, 11:49 a.m.)

REPORTER'S CERTIFICATE


        I, Kathy J. Anderson, Official Court Reporter for the
United States District Court for the Western District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a full, true and correct transcript of the
proceedings had in the within entitled and numbered cause on
the date hereinbefore set forth; and I do further certify that
the foregoing transcript has been prepared by me or under my
direction.



                         /s/ Kathy J. Anderson
                         Kathy J. Anderson, RPR, FCRR
                         U.S. District Court Reporter
                         412 Federal Building
                         Grand Rapids, Michigan   49503